## Henson's Estate

110

Before Van Dusen, P. J., Stearne, Sinkler, Klein, Bolger, and Ladner, JJ.

*J. Gowen Roper*, of *Roper & Caldwell*, for exceptants.

*John Blakeley*, of *Middleton, Blakeley & Richardson*, *C. Leo Sutton*, and *John C. Bell*, contra.

LADNER, J., June 2, 1939.—It will be helpful to a correct understanding of the question raised by the exceptions, to state who the parties to the controversy are, and how the question arises.

Testator gave his residuary estate in trust to pay the net income therefrom to his widow, during her life, and at her death "to set apart and invest in good legal securities sufficient of the corpus of my said estate to yield an income of twenty dollars per week, to collect the income of such investments and to pay said income to or for the support and maintenance of my daughter, Annie E. Henson, and my son, Horace Henson, each the sum of ten dollars per week so long as each shall live"; these will hereafter be called annuitants. Testator gave the rest of the residuary estate, at the death of his widow, in equal shares to his three sons, Frank W., Arthur A., and James P. Henson, "absolutely", with provision that if any fail to survive the testator, then to that son's issue surviving or in default of issue, "the share of said deceased son shall go to increase the shares of the other of my sons".

Frank W. died during the widow's lifetime and his surviving children, William F. and Nellie M. Myers, took their parent's share: Henson's Estate, 13 Dist. R. 288 (1904). The parties thus entitled to the residuary estate will hereafter be referred to as "residuary legatees".

Next, testator disposed of that portion of his estate set aside for the annuitants by bequeathing the same at the respective deaths of the annuitants to his sons, Frank W., Arthur A., and James B. Henson, in equal shares, "or if any of them be then deceased, his share to his lawful issue or in default of such issue to increase the shares of the other of his said sons". Those entitled to thus take in remainder will hereafter be referred to as "remaindermen".

Frank having died before the first annuitant's death, his issue takes in his stead. James and Arthur died after the first annuitant's death and before the death of the second; James leaving issue, Arthur not. The first annuitant (Annie) died December 2, 1909, and by the adjudication of Dallett, J., January 29, 1910, a part of the corpus, originally set apart to secure the income of the annuitants, was distributed to the parties entitled who then were residuary legatees as well as remaindermen. That situation no longer exists because two of the residuary legatees, Arthur and James, having died before surviving annuitant, Horace, ceased to be remaindermen. At the audit their assignee, the exceptant, pressed their claim as residuary legatees.

The fund before the present auditing judge (Sinkler, J.) is the corpus set aside for Horace by Judge Dallett, January 29, 1910, and which was calculated by capitalizing Horace's annuity of $520 a year on a three percent basis.

Exceptant asks the auditing judge to find that, since actual experience showed the amount thus set apart earned an average of five percent, the sum of $10,400 would have been "sufficient to have yielded $520 a year. Therefore, as to the sum of $17,333.34 set aside by Judge Dallett, $6,993.34 thereof is in excess of what was actually required, which excess should now be distributed to the residuary legatees or their assigns under the doctrine of Scull's Estate, 52 Pa. Superior Ct. 87." The learned auditing judge refused so to find and awarded

the corpus, including the alleged excess capitalization, to the remaindermen.

The exceptions filed charge this action of the auditing judge to be error. It may be said in passing that two other questions were also submitted to the auditing judge involving the disposition of the excess income, but as the rulings thereon are not challenged by any exceptions of either of the parties they need not be reviewed.

We gather the argument of the learned counsel for exceptant to be that testator directed to be "set aside" only *"sufficient* of the corpus of the estate" to yield the fixed annuity, and that only what was shown by actual experience to have been "sufficient" is all that testator meant to give to the remaindermen; the excess beyond that being in effect a withholding from the residuary legatees of what testator intended them to have. To put the argument even more strongly, we are asked to say that the amount now actually demonstrated to have been in excess of the necessary requirements should be treated as though it were an undistributed part of the residuary estate withheld out of abundant precaution to protect the annuitant's income.

This argument is plausible and might be regarded as sound except for the record in this case. We must start with the proposition that where a testator directs by a phrase such as here, that a part of his estate be "set apart and invested in good, legal securities sufficient to yield an income of twenty dollars a week", the question of how much shall be set aside is one of fact for the auditing judge to decide. Unless, as is frequently done, the amount be fixed by an agreement of all parties in interest with the approval of the auditing judge, as was done in McManus' Estate (July term, 1926, no. 2507, adjudication of Lamorelle, P. J.), the duty devolves upon the auditing judge to fix it. Years of experience have demonstrated the wisdom of fixing the capitalization of the annuity on a basis of three percent as a sum sufficient to make certain

beyond all contingencies the payment specified. See Mullen's Estate, 16 Phila. 306 (1883), Hanna, P. J., and Wistar's Estate, 13 Phila. 266 (1879), Penrose, J., for discussion of the reason. True, upon request, or of his own motion, an auditing judge may, as was done by Penrose, J., in Scull's Estate, supra, preserve to the residuary legatees, whose bequests may have been reduced by such a capitalization, a contingent right to share in the excess income or principal, should actual experience demonstrate the excess to have been unnecessary to produce the specified annuity, but when this is not done then clearly the amount so fixed must be regarded as a judicial determination of the matter submitted to the court, which, when confirmed absolutely and unappealed from, is to be regarded as irrevocably fixed and binding upon all parties or their privies. We cannot do better in support of this proposition than to quote the language of the learned Judge Gest in an adjudication in this very case, Henson's Estate, 12 D. & C. 128 (1929), when application was made to him at a prior audit by the residuary legatees to reduce the amount set apart by Judge Dallett:

". . . no authority is cited by the learned counsel for the parties to show that the amount of the *corpus* may be reduced at the discretion of the Auditing Judge who audits a subsequent account, when the rights of the parties have become fixed and determined by prior adjudications, which established as a judicial finding what was in the language of the will a 'sufficient' sum. I am of opinion that this is *res judicata*. Moyer's Estate, 141 Pa. 125; Brown's Estate, 190 Pa. 464; Lambert's Estate, 57 Pa. Superior Ct. 262; Michener's Estate, 227 Pa. 284, are somewhat in point as to the conclusiveness of such an adjudication."

Because Judge Gest there also made a finding that in any event the amount set apart could not then be safely reduced, the court in banc, in dismissing exceptions to his adjudication, felt it unnecessary to then pass upon the question of res adjudicata, reserving consideration of that

question until an accounting pursuant to the death of the annuitant was had. That time has arrived, the question is now before us, and we approve the legal principle as stated by Judge Gest.

With this principle to guide us, we proceed to ascertain what the earlier adjudications in this estate disclose. The first adjudication setting aside a portion of the estate as a corpus for the annuitants was that of Judge Ashman, January 13, 1904, wherein he approved the schedule of distribution setting apart $34,500. However, a review appears from the record to have been granted to correct certain errors and mistakes in that and the subsequent account. For some reason which does not clearly appear in the record, possibly because of the intervening insolvency and liquidation of the City Trust Company and the substitution of the Commonwealth Title Insurance and Trust Company as trustee, the residuary estate was again accounted for by the new trustee in an account audited by Judge Penrose, who by his adjudication, January 15, 1906, again directed the setting apart of a corpus to provide an income for the annuitants in the following language:

"There will be set apart and retained in trust for the two children of the decedent above named, securities to an amount sufficient to make certain beyond all contingencies the payment to them specified in the will—the surplus income, if any, being payable to the parties entitled, their assigns or attaching creditors."

Pursuant to the said schedule of distribution securities and cash, aggregating $37,700 were set apart and awarded to the Commonwealth Title Insurance and Trust Company as trustee for the annuitants. No exceptions were filed to the adjudication nor to the schedule annexed thereto duly approved.

Counsel for exceptant argues that the language thus used by Judge Penrose with relation to the surplus income was, in effect, a reservation by Judge Penrose to residuary legatees of a right to claim any excess prin-

cipal not needed to protect the specified annuities. We are, however, spared the necessity of determining that question, because the death of the annuitant, Annie, December 2, 1909, made a portion of the $37,700 thus set apart distributable among the parties then entitled. Accordingly, we find that by adjudication dated January 29, 1910, Judge Dallett, before whom this sum was properly accounted for (there having been but one sum set apart for both annuitants and not one half for each), made the following finding:

"There was no objection to the account which shows a balance of principal of $37,561.76, of which such sum, composed of securities of undoubted value (and other than real estate) as capitalized on a three percent basis will yield the sum of $520 a year, will be retained by the accountants as trustee for Horace B. Henson for the uses and purposes declared by the testator's will."

The rest of the balance was then awarded one-third each to Arthur A. Henson and James C. Henson, and one-sixth each to the children of Frank Henson, deceased, namely, William F. Henson and Nellie M. Myers. It will be noted that the award to them was by name and not in any particular capacity as remaindermen or as residuary legatees, for, as we have seen, at that date the remaindermen and the residuary legatees were the same parties. Pursuant to this adjudication, as appears by report of an examiner, attached thereto and dated April 19, 1911, approved by the auditing judge, there was set apart $17,333.34 as the corpus computed as directed by the adjudication. No exceptions were filed to this adjudication and in due course it was confirmed absolutely. It contains no reservation to the residuary legatees of any rights to any excess principal. It must therefore be regarded as res adjudicata and a final determination of what sum testator meant by the words "sufficient to yield," etc. The rights of all parties in interest having

thus been fixed, it cannot now be reëxamined at a subsequent account by a subsequent auditing judge.

As testator failed to specify the amount in dollars to be set aside to produce the annuity, he placed upon the court the burden of determining what the "sufficient" amount should be, and when thereafter he gave the corpus so to be set aside to the remainderman, he necessarily gave as the legacy to the remainderman the sum which the court fixed. The court's original finding must thus be regarded as having all the attributes of a judicial finding on a question of fact and as such is binding upon all parties or their privies.

While the result may appear inequitable, it must be remembered that this is only because the residuary legatees, and those claiming in their right, acquiesced in the amount set aside in Judge Dallett's adjudication, and while it is, of course, true that their failure to apply for a reservation of the question may have been due to the fact that they were at that time both residuary legatees as well as remaindermen, they were bound *then* to take notice of the possibility of their dying before the annuitant.

The situation so regarded is no different from that which frequently comes before the auditing judge as, e. g., where the testator gives to his executors a "reasonable" commission, or to a legatee a sum sufficient to buy admission to an old ladies' home, etc. In such cases the finding of the auditing judge is always accepted as final. It follows the present auditing judge was correct in his rulings which are the subject of exceptions before us.

There remains but to be said that the learned auditing judge was also right in distinguishing Scull's Estate, supra. To what he has so well said in his adjudication in this regard we merely add that the auditing judge there (Judge Penrose) directed that a sum not less than $3,000 should be set aside and the excess income, if any, paid to the residuary legatees and held that the question of what sum should be payable to the remainderman

was not to be determined until the death of the annuitants. This was in unequivocal language an express reservation to the residuary legatee of the right to raise the question at the death of the annuitant, and not a settled finding which could be regarded as res adjudicata.

It may also be observed that in Scull's Estate Judge Gest wrote the adjudication of the account filed after the annuitant's death, July 15, 1911, and it was his award of the excess principal to the residuary legatees, upheld by the court in banc (Dallett, J., dissenting), which was the subject of the appeal. The fact that Judge Gest saw no inconsistency in his decision there with the position he later took in his 1929 adjudication of Henson's Estate, supra, emphasizes the importance of the absence of a similar reservation in the case before us.

The exceptions are dismissed and the adjudication is now confirmed absolutely.

BOLGER, J., dissenting.—We should not regard the action of the court in setting aside the fund to protect the annuity as expressive of testator's wishes as to what should now be done. To do so amounts to the usurpation of a power which we do not possess, and which the preceding auditing judges did not assume when they set up this fund, namely, in deciding what amount should go to the remaindermen.

Testator's direction was to invest "securities sufficient of the corpus of my said estate to yield an income" of the amounts specified.

Under the Fiduciaries Act of June 7, 1917, P. L. 447, sec. 26(c), it was the duty of the court, not only to see that the fund was sufficient to yield the annuities, but to provide "always a sufficient surplus to meet any contingent diminution or depreciation in the value or income of the estate and securities so set apart".

The act in its application to annuities seeks only the protection of the annuitant, and nowhere does it treat of the ultimate destination of the fund.

In Jones' Estate, 314 Pa. 93, the problem involved was whether the legatee of a gift payable in the future was required to take only the sum set aside by the adjudication and invested by the executors, which had greatly depreciated by unfortunate investment, or was entitled to reimbursement from residuary estate. The Supreme Court held that no segregation of this legacy should have been made until time for its payment to the legatee arrived, and awarded reimbursement from residuary estate.

As legacies payable in the future are the subject of the same statute dealing with annuities, I regard Jones' Estate, supra, as a case in point.

Testator said that the remainderman should receive at the termination of the annuity such sum as would be "sufficient to yield" the annuity. The majority opinion would award to the remainderman a sum that was more than sufficient.

I regard Scull's Estate, 52 Pa. Superior Ct. 87, as controlling. The attempted distinction between our facts and Scull's Estate, because of the express reservation of rights in the latter, is more apparent than real. To my mind, rather than constituting a distinction, it emphasizes the injustice of holding that the action of the court included as res adjudicata a matter not raised or passed upon, and determination of a question which was not then ripe for decision.

In my opinion, the action of the court was but temporary in character, namely, during the life of the annuitant, and should not be held to be finally decisive until the time arrived for the equities of the situation to be determined, and the rights of the remainderman sprang into being.

If the contention is that the trustees or court erred in setting aside too large a fund, equity and justice demand that we should not perpetuate the error but correct it.

No laches can be ascribed to the remaindermen. Not only have they appeared at this, the time of distribution,

but they were alert during the lifetime of the annuitant to assert their claims to the excess income and principal of the fund.